An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-207

NORTH CAROLINA COURT OF APPEALS

Filed:  16 September 2014

STATE OF NORTH CAROLINA

    v.

KEVIN CELLENT

Mecklenburg County
No. 11 CRS 246140

Appeal by defendant from judgment entered 12 April 2013 by Judge C. Thomas Edwards in Mecklenburg County Superior Court.  Heard in the Court of Appeals 5 June 2014.

> *Roy Cooper, Attorney General, by Narcisa Woods, Assistant Attorney General, for the State.*
>
> *Staples Hughes, Appellate Defender, by David W. Andrews, Assistant Appellate Defender, for defendant-appellant.*

DAVIS, Judge.

Kevin Cellent ("Defendant") appeals from his conviction for first-degree rape.  On appeal, he contends that the trial court (1) abused its discretion by limiting the scope of his cross-examination of the victim; and (2) committed plain error by admitting into evidence unredacted police reports concerning the investigation of the crime

for which he was charged. After careful review, we conclude that Defendant received a fair trial free from prejudicial error.

**Factual Background**

The State presented evidence at trial tending to establish the following facts: On 1 August 2011, Jennifer Lambert[1] ("Ms. Lambert") met her Social Security representative, Debra Green, at approximately 3:00 p.m. in front of a CVS store located on the corner of Mallard Creek Road and Sugar Creek Road in Charlotte, North Carolina and received payment for disability benefits. Ms. Lambert then proceeded to spend the remainder of the afternoon playing Internet sweepstakes at the Sugar Creek Business Center — which was in the same strip mall as the CVS store at which she had met Ms. Green — and at the AA Business Center directly across the street.

Around 9:00 p.m., Ms. Lambert called her mother and several friends in an unsuccessful attempt to obtain a ride home. She ultimately decided to take the bus home. While she was waiting at the bus stop on Mallard Creek Road by the CVS store, she saw a white SUV with two male occupants drive past her. The SUV then turned around and drove past

---

[1] To protect the identity of the victim, the pseudonym "Jennifer Lambert" will be used throughout this opinion.

her again.

Several minutes later, Ms. Lambert saw Defendant walking down the sidewalk towards her. Defendant approached her and inquired when the next bus was arriving. Ms. Lambert indicated to Defendant that there was a nearby sign with the bus schedule on it. Defendant then walked directly up to Ms. Lambert, pressed a pistol against her stomach and said: "You know what it is." At that point, Defendant grabbed Ms. Lambert's arm and forced her into a wooden enclosure directly behind the bus stop.

Defendant ordered Ms. Lambert to get on the ground in front of him. He took Ms. Lambert's purse and emptied its contents onto the ground. Defendant then commanded Ms. Lambert to perform oral sex on him and she complied. Defendant picked up Ms. Lambert's debit card and ordered her to give him her personal identification number. Defendant then called the phone number printed on the card and was told that the account number linked with the card had a net balance of zero.

Defendant told Ms. Lambert to get on her hands and knees and proceeded to have vaginal intercourse with her. While doing so, Defendant hit her forehead, kicked her back and shoulders, and stepped on her fingers.

Ms. Lambert then saw the white SUV she had previously

observed pull up to the bus stop. She heard the driver yell to Defendant to hurry up because the SUV was running low on gas. Defendant responded: "[A]ll right, man, I'm coming." He then got into the SUV, taking Ms. Lambert's phone with him.

Ms. Lambert gathered her belongings and ran to the Sugar Creek Business Center. Upon her arrival, she encountered Deann Gordon ("Ms. Gordon") who observed that Ms. Lambert was shaking uncontrollably. After going inside, Ms. Lambert told Ms. Gordon that she had been raped and robbed and asked in a "frantic voice" for someone to call the police and her mother. Ms. Lambert then suffered a seizure, so an employee called 911.

Officer N. Gould ("Officer Gould") with the Charlotte-Mecklenburg Police Department ("CMPD") was the first officer to arrive on the scene, and Officer Kirsten Bartsch ("Officer Bartsch"), also employed by the CMPD, arrived approximately fifteen seconds later. Ms. Lambert told Officer Bartsch that she had been raped by a man who had fled in a white SUV. Shortly thereafter, emergency medical personnel arrived to assist Ms. Lambert.

Ms. Lambert was transported via ambulance to Presbyterian Hospital at approximately 11:00 p.m. She was examined the following morning by Nurse Heather Waleski

("Nurse Waleski"), a sexual assault nurse examiner.  Nurse Waleski performed an examination of Ms. Lambert and used a rape kit to collect a DNA sample as well as other forensic evidence.

Detective Christopher Rush ("Detective Rush") with the CMPD's Sexual Assault Unit was assigned to investigate the case on 2 August 2011.  Detective Rush met with Ms. Lambert on 11 October 2011 and showed her a picture of Defendant.  Ms. Lambert identified Defendant as her assailant.  On 14 October 2011, Detective Rush met with Defendant, and after interviewing him, he obtained two DNA samples from Defendant.

Shereen Elghamrawi ("Ms. Elghamrawi"), an expert in forensic serology and DNA analysis with the CMPD Crime Lab, analyzed the evidence obtained from the rape kit used on Ms. Lambert.  Ms. Elghamrawi developed a DNA profile from the rape kit samples and compared them to the DNA samples obtained from Defendant by Detective Rush.  Using statistical analysis software, she formed the opinion that the DNA profiles were a match and that "[t]he probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 16.5 quadrillion for Caucasians; 1 in 121 trillion for African-Americans, and 1 in 21.1 quadrillion for Hispanics."

On 24 October 2011, Defendant was indicted on (1) one count of first-degree rape; (2) one count of first-degree sexual offense; (3) one count of first-degree kidnapping; (4) one count of robbery with a dangerous weapon; and (5) one count of communicating threats. A jury trial was held in Mecklenburg County Superior Court on 8 April 2013.

Nurse Waleski testified at trial and stated that Ms. Lambert suffered an acute break in the skin of her fossa navicularis in her vaginal area that, in her opinion, was caused by blunt force trauma. Nurse Waleski also stated that during her examination of Ms. Lambert, Ms. Lambert related the manner in which the incident occurred, telling Nurse Waleski that she had been hit on her forehead, back, and shoulders and that her fingers had been stepped on. Nurse Waleski testified that Ms. Lambert's injuries were consistent with her account of the incident.

Defendant was convicted of one count of first-degree rape and was acquitted of first-degree sexual offense, first-degree kidnapping, and robbery with a dangerous weapon. The trial judge dismissed the communicating threats charge. Defendant was sentenced to 220-273 months imprisonment and ordered to register as a sex offender and to enroll in satellite-based monitoring for the remainder of his natural life. Defendant gave notice of appeal in

open court.

## Analysis

### I. Cross-Examination of Victim

Defendant's first argument is that the trial court abused its discretion by limiting the scope of Defendant's cross-examination of Ms. Lambert pursuant to North Carolina Rule of Evidence 611(b). Specifically, Defendant contends that the trial court erred by prohibiting his trial counsel from fully cross-examining Ms. Lambert, and attempting to impeach her credibility, by questioning her about (1) a bottle of pills found in her purse; and (2) the fact that prior to this incident she had committed a probation violation by failing to provide an accurate address to her probation officer.

At trial, Defendant's counsel was able to elicit testimony from Ms. Lambert that at the time of the 1 August 2011 incident, she was on probation for a felony. However, when Defendant's counsel attempted to question her about the conditions of her probation, the State objected, and the trial court proceeded to conduct a *voir dire* examination outside of the presence of the jury. During the *voir dire* hearing, Ms. Lambert testified, in pertinent part, as follows:

THE COURT: All right. Mr. Loven, what is it that you think is relevant to this inquiry.

VOIR DIRE BY MR. LOVEN:

Q. Didn't your probation have a curfew?

A. Not at this time, no, it didn't.

Q. Did they have any conditions upon not being in the possession of any controlled substances outside of your prescription bottles?

A. I believe so.

Q. Isn't it true that one of those bottles from your purse is not in a prescription bottle?

A. All of them are prescription bottles.

Q. Isn't the Abilify in a bottle that does not have a prescription on it?

A. This is the way the prescriptions come in the Abilify bottle.

Q. Didn't you just previously testify that it came in a box and that the box had a label?

A. The box is sealed when you get your medication, so you can't open the box and put the label on it.

Q. Does that bottle contain a prescription label on it?

A. It says —

Q. Does it have your name on it?

A. No, it's the label.

Q. So that bottle is not a bottle with a prescription label on it, is it?

A. The bottle itself, no.

Q. And that would have been a violation of a condition of your probation?

A. Absolutely not. Absolutely not. My medical records show that I'm on Abilify. It was prescribed from all of my doctors.

Q. Isn't it true that you were subsequently violated for probation violations?

A. In the past.

Q. Right after this?

A. I was already in violation of the probation.

Q. I'm sorry. Why where you in violation?

A. It could have been fines. I don't recall because I'm no longer on probation.

Q. At the time you were on probation; correct?

A. I was on probation and I was also displaced, meaning homeless, so it was possible that I was in violation because I didn't have an address or I hadn't paid the fines in a timely fashion.

Q. Didn't you testify you were living with your mother?

A. I was staying with my mother. You can't live in a senior citizen building.

Q. Had you given an address to your probation officer?

A. Yes. My probation officer had that address where I could be located.

Q. So are you saying you were in violation of the terms of your probation by where you were living?

A. I don't know what the terms of the violation were at the time because at the time I did not violate.

Q. Okay. Did you have to give the probation officer an address?

A. They always had an address. They came and visited me at my mother's.

Q. Okay. And that's where you told them you were living?

A. At the time of the rape I was staying at my mother's. A few weeks prior I was kind of in between houses and did not have an address. That may have caused an issue.

Q. Well, did it cause an issue? You said you were in violation of probation.

A. Now that I think about it, because I haven't thought about this, Mr. Loven, in two years, the time the probation officer did violate me because he did not know the address for which I was living because I had no contact for the two weeks before I was able to get permission to stay in my mother's senior citizen building.

Q. Okay. Weren't other conditions of your probation that you not test positive for drugs?

A. That's true.

Q. Okay. Had you been given any tests ever while on probation?

A. Sure.

Q. Had you ever failed any?

A. Previously.

Q. Didn't you testify — excuse me. Didn't the records you gave to the hospital say you never used drugs?

A. No. They asked me did I use any. I said no.

Q. You said you tested positive. Are you saying those tests were incorrect?

A. Say that again.

Q. You just testified that you used drugs.

A. I take prescription medication. The drugs in question are illegal street drugs. I was not taking them at that time. I had been on probation for almost seven, eight years. Over the course of that eight years I hadn't.

Q. You had previously tested positive for street drugs?

A. In the past.

Q. And that was a violation of your probation?

A. That violated me, it did.

Q. And if you were to test positive for street drugs again that would also have

been a violation of your probation at that time; correct?

A. If they came to test me on one of my appointments, yes, I would have been violated.

MR. MERRIWEATHER: I ask that she be allowed to answer.

THE COURT: Sustained.

BY MR. LOVEN

Q. And you still had a probation officer at this time?

A. That's correct.

Q. Who could have tested you?

A. That's correct.

. . . .

Q. One last question. You were subsequently violated on this probation; correct?

A. Yes, I was.

Q. What was the reason for that violation?

A. Because they had not been able to locate me in the past. They did not know my mother's address, so he said, and if you further continue to question, my probation was released and I was not punished any further.

Q. You were found to be in violation of probation?

A. The probation officer violated me but the judge released me.

Q. Did the judge terminate your probation or find no violation?

A. Terminated probation.

Q. So there was no finding one way or the other, was there?

A. Termination. I don't know what the terms mean. It was terminated.

Defendant's trial counsel then made the following argument to the trial court:

MR. LOVEN: Your Honor, we would contend as far as motive here, somebody to claim — make a false accusation under these circumstances, she would have potentially have been in violation of probation had the police searched her, so this would be a motive for her to give a description of something else and, therefore, goes to her credibility as a witness.
Also, although this is out of the presence of the jury, I think some questions as to her ability to recall these events and relate to — saying what she's done previously has come up yet again, but, of course, this was out of the presence of the jury.

THE COURT: All right. So your request to examine further into the probation violation is denied. The Court will find that the questions posed do not address the issues of truthfulness of this client [sic] and will not allow you to examine her further with regard to that.

Rule 611(b) of the North Carolina Rules of Evidence provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including

credibility." N.C.R. Evid. 611(b). Rule 611(a) restricts the scope of subsection (b), however, by providing that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." N.C.R. Evid. 611(a).

> While it is axiomatic that the cross-examiner should be allowed wide latitude, the trial judge has discretion to ban unduly repetitious and argumentative questions, as well as inquiry into matters of tenuous relevance. Moreover, the trial judge retains the discretion to prohibit cross examination that is intended to harass, annoy or humiliate a witness. The trial judge's rulings in controlling cross examination will not be disturbed unless it is shown that the verdict was improperly influenced.

*State v. Hatcher*, 136 N.C. App. 524, 526, 524 S.E.2d 815, 816 (2000) (internal citations, quotation marks, and brackets omitted).

### A. Possession of Pills

Defendant contends that the trial court abused its discretion in refusing to allow Ms. Lambert to be cross-examined about her possession of the pills contained in her

purse because "[Ms.] Lambert had a motive to lie to police officers about what happened with [Defendant] in order to avoid having her probation revoked because she possessed controlled substances." We believe the trial court acted within its discretion in barring cross-examination on this topic for two reasons.

First, Ms. Lambert testified that the bottle of pills she possessed contained Abilify — a mood stabilization drug that had been prescribed to her by a physician. She explained that the pill bottle did not have her name on it because the Abilify bottle came packaged in a box with her name and prescription listed on the box itself instead of on the bottle. Defendant failed to offer any evidence rebutting Ms. Lambert's testimony that the pills had been prescribed to her by a physician such that her possession of them would not have constituted a violation of the conditions of her probation.

Second, and more basically, it was *Ms. Lambert* who requested that the police be called in the first place. Upon reaching the Sugar Creek Business Center and encountering Ms. Gordon, Ms. Lambert frantically told her to "[p]lease call my momma. Please call the police." As such, Defendant's contention that she had a motive to fabricate the allegation of rape to distract police

officers from finding the pills in her possession is undermined by the fact that she was the one who requested that law enforcement officers be called. Accordingly, the trial court did not abuse its discretion in barring cross-examination about this subject.

## B. Failure to Provide Accurate Address to Probation Officer

Defendant further argues that the trial court abused its discretion by not allowing his trial counsel to cross-examine Ms. Lambert about the fact that she had previously violated the terms of her probation by failing to keep her probation officer continually advised of the address at which she was living during her probation period. During *voir dire*, Ms. Lambert testified that she "was kind of in between houses and did not have an address" for a short period of time during her probation period because she was homeless but that she subsequently moved in with her mother and advised her probation officer that she could be reached at her mother's residence.

Ms. Lambert's *voir dire* testimony did not clearly establish that she had actually lied to her probation officer about her address. Rather, it suggested that she had failed to make him aware of a two-week period during which she was homeless while she sought permission to live

in her mother's building.  Given the tenuous relevance of this testimony to Ms. Lambert's truthfulness, we believe the trial court acted within its discretion in refusing to allow cross-examination on this subject.

## II. Admission of Unredacted Police Reports

Defendant's final argument is that the trial court erred in admitting into evidence two unredacted police reports indicating that investigating officers found Ms. Lambert's allegations to be credible.  Because Defendant did not object at trial to the admission of these reports, we review this contention solely for plain error.

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations, quotation marks, and brackets omitted).

The two reports at issue are preprinted forms containing statements made by Ms. Lambert and Ms. Gordon,

respectively. Defendant does not contest the admissibility of the witness statements themselves that are contained on these forms. Rather, he challenges the failure to redact notations made by officers on these forms before the forms were admitted into evidence.

The first report was a statement provided by Ms. Lambert to Officer M. Bell ("Officer Bell") on 1 August 2011. Ms. Lambert dictated her account of the subject incident, and Officer Bell transcribed her account on the report form which Ms. Lambert subsequently reviewed and signed.

The first page of this report contained a box titled "Original Offense/Charge." Next to this box, Officer Bell wrote: "Sexual Assault/1st Forcible Rape." Officer Bell also checked "Open" in connection with the box on this report which was titled "UCR Clearance Status" and also checked "Active" as to the box titled "Investigative Status." On the second page of the report, in the third box titled "Original Offense/Charge," Officer Bell wrote "1st Rape (Forcible)" and wrote "1st Degree Forcible Rape" in a subsequent box titled "Correct Incident Classification." Officer Bell also checked "Open" and "Active" in two additional boxes on that page titled "UCR Clearance Status" and "Investigative Status," respectively.

The second report was a statement provided by Ms. Gordon to Officer Gould on 1 August 2011 at the Sugar Creek Business Center shortly after Ms. Lambert had been taken to the hospital. Ms. Gordon dictated the account of her interaction with Ms. Lambert from the time Ms. Lambert ran up to her in the Sugar Creek Business Center parking lot until the time the 911 call was made. Officer Gould transcribed her account on the report form, and Ms. Gordon subsequently signed it.

On this report, Officer Gould wrote "Forcible Rape (1st Degree)" in connection with a box titled "Original Offense/Charge" and wrote "Forcible Rape (1st Degree)" in a subsequent box titled "Correct Incident Classification." Officer Gould also checked "Open" with regard to a box titled "UCR Clearance Status" and checked "Active" in connection with a box titled "Investigative Status."

Defendant argues that these notations on the two forms conveyed to the jury the notion that the police officers believed Ms. Lambert's account of the incident. Even assuming, without deciding, that the trial court erred in allowing these unredacted reports to be admitted, we believe any such error does not rise to the level of plain error.

The evidence against Defendant at trial was overwhelming as to the rape charge. Ms. Lambert identified Defendant as her assailant in a photograph shown to her by Detective Rush. DNA analysis matched Defendant's DNA with the semen found in Ms. Lambert's body. At the time Ms. Lambert reported the rape, she was shaking uncontrollably and speaking in a "frantic" tone of voice. She subsequently suffered a seizure. Nurse Waleski's examination of Ms. Lambert confirmed the presence of the injuries to her forehead, back, shoulders, and fingers that corroborated Ms. Lambert's account of the incident. In addition, Nurse Waleski testified that the injuries to Ms. Lambert's genital area, notably a break in the skin of her fossa navicularis, were caused — in her opinion — by blunt force trauma and were consistent with the types of injuries commonly suffered in cases of sexual assault.[2]

Thus, we conclude that Defendant has failed to meet his heavy burden of demonstrating plain error. *See State v. Ross*, 207 N.C. App. 379, 396, 700 S.E.2d 412, 424 (2010)

---

[2] While Defendant points to a statement made by Nurse Waleski on cross-examination that she could not say whether Ms. Lambert's injuries came from consensual or nonconsensual intercourse, there was no evidence offered at trial regarding a consensual sexual encounter. Moreover, as noted above, Nurse Waleski's opinion was that the injury to Ms. Lambert's vaginal area was the result of blunt force trauma.

("Even assuming *arguendo* that it was error for the trial court to allow the introduction of the detective's [hearsay] testimony . . . we conclude that it did not rise to the level of plain error, as the record in the case *sub judice* contains overwhelming evidence of defendant's guilt."), *disc. review denied*, 365 N.C. 346, 717 S.E.2d 377 (2011); *see also State v. Johnson*, 203 N.C. App. 718, 723, 693 S.E.2d 145, 147-48 (2010) (declining to decide whether trial court erred in admitting statement in computer-generated police report summarizing actions police officer took on morning of defendant's arrest because even if admission of document was erroneous, its admission was not prejudicial).

**Conclusion**

For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges HUNTER, JR. and ERVIN concur.

Report per Rule 30(e).

Judge HUNTER, JR. concurred in this opinion prior to 6 September 2014.